```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
                      Civil No. 04-4357(DSD/RLE)


Lisa Vajdl,

              Plaintiff,

v.                                                        ORDER

Mesabi Academy of KidsPeace,
Inc., KidsPeace Corporation,
and Michael Muehlberg,

              Defendants.
```

Julie A. Matonich, Esq. David A. Arndt, Esq., Edward J. Matonich, Esq. and Matonich & Persson, 2031 Second Avenue East, P.O. Box 127, Hibbing, MN 55746, counsel for plaintiff.

Lee M. Friedman, Esq., Daniel R. Wachtler, Esq., R. Ann Huntrods, Esq. and Briggs & Morgan, 80 South Eighth Street, Minneapolis, MN 55402, counsel for defendant KidsPeace Corporation.

Elizabeth A. Storaasli, Esq., Mark L. Knutson, Esq. and Agnew, Dryer, Storaasli, Knutson & Pommerville, Suite 200 Sellwood Building, 202 West Superior Street, Duluth, MN 55802, counsel for defendant Michael Muehlberg.

This matter is before the court upon defendants' motions for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendants' motions.

**BACKGROUND**

Plaintiff Lisa Vajdl filed this employment discrimination action under the Minnesota Human Rights Act ("MHRA") and Title VII of the Civil Rights Act of 1964.  See 42 U.S.C. §§ 2000e-1-17; Minn. Stat. §§ 363A.01-.41.  Defendant Mesabi Academy of KidsPeace, Inc., ("Mesabi Academy") is a juvenile correctional facility that provides residential, educational and vocational training for male youth who have been convicted of violent offenses.  Defendant KidsPeace Corporation ("KidsPeace") owns and operates Mesabi Academy.  Defendant Michael Muehlberg is a Mesabi Academy youth care worker.  In this action, Vajdl asserts claims of hostile work environment, retaliation and constructive discharge under Title VII and the MHRA based on the sexually harassing conduct of the youth who resided at Mesabi Academy and her co-workers.

On August 18, 2003, Mesabi Academy hired Vajdl as a temporary youth care worker.  During her interview, Mesabi Academy's program director, Lance Edminster, informed Vajdl that she would be working with dangerous youth and that, as a result, she may encounter dangerous and aggressive behavior throughout her employment at Mesabi Academy.  (Vajdl Dep. at 45-46.)  As a youth care worker, Vajdl was responsible for maintaining the safety and security of the facility, interacting with the youth, supervising and counseling youth and escorting youth to activities.

Once hired, Vajdl participated in a two-week orientation program and received training on a variety of topics, including Professional Care Management ("PCM"). (See id. Ex. 3.) PCM is an intervention system Mesabi Academy uses to deescalate and manage violent crisis situations with the youth. During the first week of orientation, KidsPeace training specialist, Kevin Lantz, informed Vajdl that she would be working on the Endeavor and Discovery units, which both house youth who have been convicted of sex offenses and are receiving sex-offender treatment. During the second week of her orientation, Vajdl worked three shifts in the Endeavor Unit and her supervisor during those shifts was Jeremy Hoover. (Id. at 46.) Following orientation, and throughout the remainder of her employment at Mesabi Academy, Vajdl worked in the Discovery Unit and at all relevant times her supervisor was Paul Jacobson. (Id.)

As a youth care worker in a sex offender unit, Vajdl's responsibilities also included helping youth act appropriately based on their sexual urges and feelings and issuing appropriate sanctions in response to inappropriate youth conduct. (Id. at 57-58, 71.) When youth acted out, the youth care worker towards whom the conduct was directed is the person would issue an appropriate sanction in response. (Id.) Vajdl received specific training on how to handle sex offenders in October of 2003 and January of 2004. (Id. at 70.)

3

I.   **Conduct of Youth**

Vajdl claims that she was subjected to unwelcome comments and harassing conduct on a daily basis by the Mesabi Academy youth.  In general, youth would look at staff members' chests and rear ends, write fantasies of what they wanted to do with staff and state they wanted to rape and attack staff.[1]  (Id. at 72.)  Specifically, Vajdl identifies four youth who harassed her: J.W., N.S., C.L. and D.T.

J.W. was housed in the Discovery Unit and told Vajdl that he wanted to act out against her and attack her.  In response, Vajdl talked to J.W. and did not sanction him.  (Id. at 107-108.)  Vajdl did not report any concerns regarding the conduct of J.W. to her supervisor or Mesabi Academy management.  She did, however, discuss general concerns regarding J.W. with a shift manager, Phil Borowicz.  (Id. at 84.)

N.S. was also housed in the Discovery Unit and was a known stalker.  N.S. admitted that he had a crush on Vajdl and would engage in stalking behavior around her.  N.S. would stare at Vajdl for hours and frequently act as though he wanted to attack her.  One day, N.S. admitted during a group counseling session that he wanted to attack Vajdl.  That comment was subsequently discussed in a group meeting and Vajdl did not sanction him.  (Id. at 83.)  On

---

[1]  Writing fantasy track sheets was part of the sex offender treatment program that the youth participated in.  (Vajdl Dep. at 108.)

4

another occasion, while in Mesabi Academy's Secure Unit, N.S. stared at Vajdl while locked in his cell. Two weeks later N.S. admitted to a shift manager that he had dropped his pants while staring at her. Vajdl often imposed sanctions on N.S. for his inappropriate conduct and would utilize PCM to deescalate situations that he created. (Id. at 74-75.) She discussed any general concerns that she had about N.S. with Borowicz. (Id. at 84.) Throughout her employment, however, she did not report any specific concerns regarding N.S. to her supervisor or any other member of Mesabi Academy management.

In response to N.S.'s known stalking behavior, and prior to Vajdl's employment, Mesabi Academy specifically developed and implemented a Context Antecedent Behavior Consequence Plan ("CABC plan") to address the manner in which employees were to respond to N.S. when he engaged in stalking. (See id. Ex. 4.) Mesabi Academy also required that N.S. have a one-on-one youth care worker who sat outside of his room and kept constant and close watch on his activities, although this policy was not consistently implemented. (Id. at 88-89.)

C.L. and D.T. were not housed in the Discovery Unit but would threaten Vajdl and make inappropriate comments to her when she encountered them during group activities or in the Secure Unit. C.L. was housed in the Enterprise Unit and would frequently stare at Vajdl while in common areas. Vajdl never sanctioned C.L. for

the staring or requested that a sanction be imposed.  (Id. at 102.)
One day, C.L. gave her a letter stating, among other things, that
if the two of them could not be together he would take her to a
place where there was no pain.  (Id. at 103.)  Vajdl reported the
letter to her supervisor, Jacobson, as well as an investigator of
youth misconduct, Harry Graham.  Vajdl claims that, in response,
Jacobson asked her why she did not find the letter to be
flattering.  (Id. at 105.)  Graham, however, told Vajdl to inform
C.L.'s counselor about the letter incident.  The Enterprise Unit's
counselor, Nicole Curphy, later informed Vajdl that C.L. was talked
to and that the letter was sent to a mental health facility.  (Id.)
Following the letter incident, C.L. never harassed Vajdl again.

The most extreme individual behavior that Vajdl alleges is
that of D.T. On October 30, 2003, while in the auditorium, D.T.
approached Vajdl and said to her,  "I don't like it that you're not
paying attention to me. You should be saying hi to me. This pisses
me off."  (Id. at 90.)  Vajdl issued D.T. a sanction in response
but, upon advice of a co-worker, did not personally give the
sanction to D.T.  Rather, a co-worker gave D.T. the sanction and
sent him to the Secure Unit.  Mesabi Academy documented the
incident and implemented a responsive plan to hold D.T. accountable
for his behavior.  (Id. Ex. 5.)  Vajdl told Jacobson about the
October 30 incident.

On two other occasions, Vajdl encountered D.T. while he was in the Secure Unit.  On the first occasion, D.T. said to Vajdl, "I'm going to kill you, you bitch. I want to spit in your face," and called her "Preston's bitch" and "Secure's bitch."  (Id. at 93.) Vajdl's co-workers in the Secure Unit physically restrained D.T. and placed him into a cell.  From his cell, he continued to berate Vajdl with comments, including that he hated her, that he was going to spit in her face and that she was going to die.  D.T. made the comments until Vajdl left the Secure Unit. (Id. at 93.)  On the second occasion, D.T. was not in a cell and upon seeing Vajdl yelled, "Why the hell does she have to be here.  I hate her.  I'm going to start trouble.  There's no reason why she should have to be here.  I hate this bitch.  I want her gone." (Id. at 97.)  In response, Vajdl's co-worker deescalated the situation using PCM. Vajdl never informed a supervisor or a member of Mesabi Academy's management about the Secure Unit incidents.  (Id. at 101.)

## II.  Conduct of Co-workers

Vajdl also claims that she was subjected to harassing conduct by three co-workers throughout her employment: John Gustafson, Michael Muehlberg and Joel Lawson.

### A.    John Gustafson

During the three shifts that she worked in the Endeavor Unit, Vajdl worked with John Gustafson, a youth care worker.  During those shifts, Gustafson made several inappropriate comments to

Vajdl.  For example, he would say to her, "Why don't you bend over so we can send [a youth] into crisis." (<u>Id.</u> at 50-51.)  Vajdl told her training manager, Kevin Lantz, that she was concerned with Gustafson's professionalism.  Lantz told Vajdl he would look into the conduct.

After Vajdl was assigned to the Discovery Unit, she never worked another shift with Gustafson.  However, Gustafson would make comments to Vajdl when she encountered him during shift changes or while in common areas.  During one shift change, Gustafson again asked Vajdl to bend over so that a youth would go into crisis. (<u>Id.</u> at 197-98.)  On another occasion, Gustafson told Vajdl he wanted to pleasure her by licking her from head to toe.  (<u>Id.</u> at 196.)  In the cafeteria one day, while standing close to Vajdl and another female co-worker, Gustafson  stated that he could not take the pressure of standing next to two beautiful women.  (<u>Id.</u> at 199.)  Following her assignment to the Discovery Unit, Vajdl never reported any of Gustafson's comments to a supervisor or member of Mesabi Academy management.

### B.   Michael Muehlberg

Michael Muehlberg was a youth care worker in the Discovery Unit and worked with Vajdl.  Muehlberg repeatedly told Vajdl that he liked to look at her rear end and chest.  (<u>Id.</u> at 142.) Muehlberg would also often tell Vajdl that one of the youth was looking at her and ask if it was okay if he looked at her.  (<u>Id.</u> at

145.)  Muehlberg once whispered to Vajdl that she looked nice with her hair down.  (<u>Id.</u> 142-43.)  One day, Muehlberg told Vajdl that she might be the right woman for him and that he was looking for an old-fashioned woman who wore dresses and high heels.  When Vajdl told him that she did not wear dresses or high heels and that she had a boyfriend, Muehlberg responded "Well, what about a mini skirt?"  (<u>Id.</u> at 142.)  Vajdl claims that after she rejected his advances, Muehlberg's hostility towards her increased.  For example, on one occasion Muehlberg refused to switch shifts with her and then began questioning whether her boyfriend was right for her.  (<u>Id.</u> at 143-45.)

In addition to the comments, Muehlberg also acted inappropriately towards Vajdl.  He would stare at her chest and gently touch her fingers.  (<u>Id.</u> at 142, 149-50.)  Once, at the facility's pool, Muehlberg brushed water off Vajdl's leg. (<u>Id.</u> at 143.)  Another time, he blew softly on her bangs.  (<u>Id.</u>)  Vajdl claims that Muehlberg was persistent in his pursuit of her.  After Vajdl purchased a new car, he asked her for a ride.  (<u>Id.</u> at 144.)  He also called her at home on several occasions, purportedly to rent her a house or help her with her car.  (<u>Id.</u> at 145, 156.)  Muehlberg would ask Vajdl if he could join her whenever she mentioned that she was going for a drink or shopping after work.

On November 23, 2003, Vajdl told a shift manager, Pat Lenzen, that she intended to inform Jacobson, her supervisor, of

Muehlberg's conduct.  According to Vajdl, Lenzen advised her not to report Muehlberg's behavior to Jacobson because it was not "work related" and to let Muehlberg "bury himself."   (Id. at 162.) Following her conversation with Lenzen, Vajdl did not report Muehlberg's behavior to Jacobson or Mesabi Academy management.

On January 7, 2004, Jacobson overheard a co-worker tease Vajdl about sitting next to Muehlberg during a staff meeting.  Jacobson did not ask Vajdl about the comment at that time.  On January 18, 2004, Jacobson received an e-mail from Borowicz suggesting that Vajdl and Muehlberg should not work together because of their apparently deteriorating relationship.  (See Jacobson Dep. Ex. 5.) In that e-mail, Borowicz stated that it appeared that Vajdl and Muehlberg had been avoiding each other and that Muehlberg had been asking about Vajdl's personal life.  (Id.)  Jacobson promptly forwarded that e-mail to Lance Edminster and spoke to Vajdl's co-workers about Muehlberg's alleged inappropriate conduct.  (See Jacobson Dep. Ex. 6.)

On January 21, 2004, Jacobson asked Vajdl about the comment that he had overheard at the January 7 meeting, as well as the nature of her relationship with Muehlberg.  (Vajdl Dep. at 141.) Vajdl told Jacobson that she felt uneasy about Muehlberg due to his inappropriate staring, comments and touching and explained the general nature of Muehlberg's conduct during the prior few months. (Id. at 141-46.)  Jacobson said he would investigate her claims.

Following their conversation, Vajdl sent Jacobson an e-mail stating that she was surprised by Jacobson's initiation of the conversation and providing him further details.  (See id. Ex. 7.)  On January 27, Mesabi Academy's human resources manager, Aimee Foszpanczyk, asked Vajdl if they could meet to discuss the issues regarding Muehlberg.  Foszpanczyk and Vajdl met the next day, and Vajdl explained the nature and extent of Muehlberg's conduct.  Vajdl told Foszpanczyk that she did not report Muehlberg earlier based on Lenzen's advice.

On February 5, Mesabi Academy issued Muehlberg a final written warning that detailed much of the behavior that Vajdl had reported. (See Edminster Dep. Ex. 4.)  The warning stated that Muehlberg's behavior was completely unacceptable and had to stop immediately. Muehlberg was further advised that any retaliation against co-workers for reporting his conduct would result in immediate termination.  (Id.)  The warning set forth a corrective action plan that required, among other things, Muehlberg to undergo sexual harassment training.  (Id.)  That same day, Mesabi Academy transferred Muehlberg to the Endeavor Unit.  (Muehlberg Dep. at 48.)  Following January 21, 2004, Vajdl did not work a shift with Muehlberg and did not have any personal interaction with him that was of concern to her.  (Vajdl Dep. at 174.)

C.   **Joel Lawson**

Vajdl claims that Joel Lawson, a youth care worker, also exhibited inappropriate behavior towards her.   Vajdl first encountered Lawson in December of 2003 when he blocked her passage in a hallway until she told him to move.  Following that encounter, Lawson told Lenzen that he liked Vajdl's aggressiveness.   Lawson began to inquire about Vajdl's personal life and whether she had a boyfriend.   At one point, Lenzen told Vajdl that based upon Lawson's inquiries it appeared that she had a new "superstalker," and that she should be flattered.  (Id. at 180.)  Lawson would make flirtatious comments to Vajdl and lightly kick her ankle in a flirtatious manner.  (Id. at 179.)  He told Vajdl that he was after her and one day asked her to meet him outside so that he could tell her what he wanted from her.  (Id. at 181.)  According to Vajdl, she told Lenzen about Lawson's request and Lenzen laughed and told her that she should go see what he wanted.  Vajdl did not report any of Lawson's conduct to her supervisor or any member of Mesabi Academy's management.  (Id. at 183.)

On January 30, 2004, Lawson placed a note in Vajdl's mailbox. The note was addressed to "Lisa (for your eyes only)" and said "Ms. Vajdl – call me after 11:00 one of these nights so you can verbally abuse me! Maybe someday I could initiate you into the chocolate milk club!"  (See Lawson Dep. Ex. 1.)  Vajdl found the note extremely disturbing and reported it to Foszpanczyk.  (Vajdl Dep.

at 184.) Foszpanczyk told Vajdl that the note would be investigated. (Id. at 185.) Mesabi Academy's executive director, Bruce Strom, and Mesabi Academy's head of security, Dave Adams, as well as Lance Edminster arrived at Foscpanczyk's office in response to the note. Edminster told Vajdl that she could go home for the remainder of the day. Edminster then spoke with Lawson about the note incident. (See Edminster Dep. Ex. 2.) That evening, Edminster called Vajdl at home and informed her that he had spoken with Lawson and that the note was a misunderstanding. Following the note incident, Lawson never again acted in an inappropriate or harassing manner towards Vajdl. (Vajdl Dep. at 196.)

## III. Vajdl's Employment Record and Resignation

In December of 2003, Jacobson told Vajdl during a performance review that he was concerned about her temper with the youth. (Vajdl Dep. at 122-23.) In particular, Jacobson told her that he had received reports that she had responded to youth misconduct in anger. (See id. Ex. 6.) Vajdl admitted that during the first few months of her employment she acted out in anger. (Id. a 122-23.) Vajdl attributed her anger and frustration to her inexperience in dealing with the type of youth housed at Mesabi Academy and that she did not have thick enough skin to appropriately handle their conduct. (Id.)

On January 16, 2004, Jacobson informed Vajdl that she was being promoted to full-time status on January 19, 2004. (See

Edminster Dep. Ex. 6.)  Jacobson told Vajdl that he would recommend that she receive the promotion because he thought Vajdl would be a good full-time employee and that she had worked on the issues he had raised with her in December of 2003.  However, according to Jacobson, shortly thereafter Edminster informed him of newly discovered concerns regarding Vajdl's job performance. Specifically, Dr. Alan Listiak, the Department of Corrections sex offender program licensor for Mesabi Academy, had visited Mesabi Academy the previous week and discovered that certain youth had concerns about Vajdl's use of discipline.  (Jacobson Dep. at 18, 26; Edminster Dep. Ex. 9.)  As a result of Dr. Listiak's concerns, Jacobson interviewed two of her shift managers, Lenzen and Borowicz, as well as a co-worker, Kelly Sather, who all confirmed that Vajdl took youth misconduct personally and had difficulty managing her anger.  It was at that point that Borowicz informed Jacobson of the issues he had observed regarding the inability of Muehlberg and Vajdl to work together.  (See Edminster Dep. Ex. 9.) Based upon the above information, on January 19 Jacobson wrote a memorandum to Strom, Edminster and Foszpanczyk recommending that Vajdl's employment be terminated.  (Id.)

Contrary to Jacobson's recommendation, Vajdl's employment was not terminated.  Instead, on January 22, the day after Vajdl reported her concerns regarding Muehlberg, Vajdl received a written warning based upon the newly discovered disciplinary concerns.  The

warning identified examples of her inappropriate conduct, such as throwing a clipboard to the floor out of anger, antagonizing youth, engaging in retaliatory power struggles with youth and playing favorites.   (See Vajdl Dep. Ex. 7.)   The warning contained a corrective action plan that required, among other things, Vajdl to receive a shift manager's approval before imposing sanctions.  (See id.)  During her meeting with **Foszpanczyk, on January 28, Vajdl told Foszpanczyk that she suspected her discipline was in retaliation for her complaining about Muehlberg.**

At some point during the weekend of February 7 and 8, Muehlberg held an informal, off-site meeting with three co-workers, Gustafson, Borowicz and Pat Welsh.  Pat Welsh later informed Vajdl about the meeting and told her that Muehlberg held the meeting to discuss Vajdl's allegations of harassment against him.  On February 8, 2004, Vajdl worked her last shift at Mesabi Academy.  Vajdl resigned on February 11, 2004.  Prior to her resignation she did not inform Jacobson or anybody else on Mesabi Academy's management team about the meeting that Muehlberg held.

On May 18, 2004, Vajdl filed a charge of discrimination with the Minnesota Department of Human Rights and the Equal Employment Opportunity Commission.  On June 20, 2004, she received written notice of her right to sue.  On September 9, 2004, Vajdl timely filed this action against KidsPeace, Mesabi Academy and Muehlberg. Defendants now move for summary judgment on all claims.

15

**DISCUSSION**

**I.   Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the non-moving party. See id. at 255. The non-moving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of her claim, summary judgment must be

16

granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Id. at 322-23.

## II.   Motion for Summary Judgment by KidsPeace & Mesabi Academy

### A.   Hostile Work Environment Claim

KidsPeace and Mesabi Academy argue that Vajdl has not established a prima facie case of hostile work environment under Title VII or the MHRA.  The elements of a prima facie claim of sexual harassment based on a hostile work environment are the same under Title VII and the MHRA.  Hanenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 574 (8th Cir. 1997).  To succeed on either claim, plaintiff must show that (1) she belongs to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on sex, (4) the harassment affected a term, condition, or privilege of employment and (5) defendants knew or should have known of the harassment and failed to take proper action.[2]  Erenberg v. Methodist Hosp., 357 F.3d 787, 792 (8th Cir. 2004) (hostile work

_____

[2] Vajdl argues that a hostile work environment was created as a result of the cumulative impact of the conduct of her co-workers and the youth.  However, the court finds that these claims, and the respective underlying factual allegations,  are premised upon distinct theories of employer liability.  See Powell v. Morris, 37 F. Supp. 2d 1011, 1017 (S.D. Ohio 1999) (addressing claims involving prisoner conduct and supervisor conduct separately); cf. Slayton v. Ohio Dep't of Youth Servs., 206 F.3d 669, 677 (6th Cir. 2000) (addressing claims together where prison personnel encouraged and instigated inmate conduct).  Therefore, the court separately addresses Vajdl's hostile work environment claims based on youth and co-worker conduct.

environment created by co-workers); Crist v. Focus Homes, Inc., 122 F.3d 1107, 1111 (8th Cir. 1997) (hostile work environment created by residents of a facility).  For purposes of these motions, it is undisputed that Vajdl has established the first three elements.

To decide whether a plaintiff has demonstrated that the harassment was pervasive enough to affect a term, condition or privilege of employment, the court looks at all the circumstances, including the regularity and severity of the discriminatory conduct, whether the conduct unreasonably interfered with a plaintiff's work performance and the extent to which the conduct was humiliating or physically threatening, as opposed to merely offensive utterances.  Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1038 (8th Cir. 2005) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23 (1993)).  The threshold for actionable harm is high, and the court applies a demanding standard to ensure that Title VII is not used as a mechanism to impose a general code of workplace civility.  Id.  The harassment must be so intimidating, offensive or hostile that it "poisoned the work environment." Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999); see also Alagna v. Smithville R-II Sch. Dist., 324 F.3d 975, 980 (8th Cir. 2003) ("conduct must be extreme and not merely rude or unpleasant").  Simple teasing and offhand comments do not suffice. Al-Zubaidy, 406 F.3d at 1039 (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998).

Once an employer is made aware, or had reason to know, of sexual harassment, it must take prompt, remedial action that is "reasonably calculated to end the harassment." Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir. 1993). An employer is deemed to have notice of harassing conduct when an employee informs his or her supervisor or management personnel. Davis v. Tri-State Mack Distribs., Inc., 981 F.2d 340, 343 (8th Cir. 1992). For purposes of vicarious employer liability under Title VII, a supervisor is someone who has the power "to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties." Joens v. John Morrell & Co., 354 F.3d 938, 940-41 (8th Cir. 2004) (day shift foreman not supervisor); Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 851 (8th Cir. 2005) (foreman not supervisor if could not hire, fire or promote). To determine the reasonableness of the employer's remedial action, the court considers (1) the length of time between notice and the remedial action, (2) the substance of the action itself and (3) whether the action ended the harassment. See Meriwether v. Caraustar Packaging Co., 326 F.3d 990, 994 (8th Cir. 2003).

### 1.   Mesabi Academy Youth Conduct

An institution must take appropriate steps to prevent or remedy illegal inmate behavior. Slayton v. Ohio Dep't of Youth Servs., 206 F.3d 669, 677 (6th Cir. 2000). When a correctional

institution takes proper preventative and remedial steps in response to harassing behavior, liability for non-employee conduct will not be imposed. See Powell v. Morris, 37 F. Supp. 2d 1011, 1017 (S.D. Ohio 1999) (courts "repeatedly decline to impose sexual harassment liability upon correctional institutions for the sexually offensive conduct of inmates"); cf. Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1245 (10th Cir. 2001) (applying a negligence analysis and emphasizing that focus is not on conduct but rather employer's response, preventative measures taken and control over environment). The liability of an employer for the conduct of its inmates or residents requires a fact-intensive inquiry as to the timeliness and appropriateness of an employer's response to inappropriate behavior. Crist, 122 F.3d at 1111. The court considers the particular circumstances of the work environment, including the plaintiff's expectations given her choice of employment. See id. (analysis accounts for level of control and legal responsibility over resident); Powell, 37 F. Supp. 2d at 1017 (correctional employees assume attendant risks, such as exposure to lewd and sexually deviant behavior by inmates).

The conduct of C.L., D.T., N.S. and J.W. was undisputably offensive and threatening in nature. However, the court need not resolve whether their respective, or cumulative, conduct was severe enough to affect a condition of Vajdl's employment in a sex offender unit because the court finds that Mesabi Academy took

appropriate remedial measures in response to the conduct that Vajdl reported.  As an initial matter, Vajdl did not report many of the incidents that she now cites to as the basis of her hostile work environment claim.  During those incidents, Vajdl responded to the youth misconduct as she was trained, by issuing sanctions or using PCM.  Vajdl also summarily challenges the effectiveness and adequacy of the PCM system.  However, she has failed to identify specific flaws to that system or types of additional preventative measures that Mesabi Academy should have implemented.  Further, she has not identified an incident when the PCM system did not effectively manage the situations that she was involved in.

As to the incidents Vajdl did report, Mesabi Academy promptly responded.  For example, as a result of the incident in the auditorium with D.T., Vajdl issued him a sanction, he was designated to the Secure Unit, the incident was documented and a responsive plan implemented.  (See Vajdl Dep. Ex. 5.)  As to the letter that C.L. wrote, although Jacobson's comment may have been inappropriate, C.L.'s counselor spoke to C.L. and the letter was mailed to a mental health facility for evaluation.  Notably, C.L. never harassed Vajdl following that incident.  As to N.S., Mesabi Academy implemented an individualized CABC plan to respond to his tendency to engage in stalking.  (See Edminster Dep. Ex. 3.)  Although Vajdl testified that the Mesabi Academy employees did not consistently utilize the CABC plan, she has not identified how

21

Mesabi Academy's implementation of that plan was an inappropriate remedial action.   The court has taken into consideration the type of misconduct that the respective youth engaged in, Vajdl's personal responses to those incidents, the nature of her employment as a youth care worker in a sex offender unit and Mesabi Academy's responses to the misconduct that Vajdl reported.   Having carefully reviewed all of those factors, the court is unable to say that Mesabi Academy did not take appropriate remedial measures that were "reasonably calculated to end the harassment."   Kopp, 13 F.3d at 269.   Therefore, summary judgment in favor of KidsPeace and Mesabi Academy is warranted on Vajdl's hostile work environment claims based on youth conduct.

### 2. Co-Workers' Conduct

As to the comments and conduct of Vajdl's co-workers, the court finds that Gustafson, Lawson and Muehlberg undeniably engaged in juvenile and inappropriate conduct.[3]   However, the court finds

---

[3]     Vajdl also points to harassing conduct that Gustafson, Lawson and Muehlberg exhibited towards other female Mesabi Academy employees.   The court can consider harassment of employees other than the plaintiff to evaluate the pervasiveness of the hostile work environment.   Howard v. Burns Bros., Inc., 149 F.3d 835, 838 (8th Cir. 1998).   However, nearly all of the harassment of other employees that Vajdl has identified occurred prior to her employment.   This conduct is relevant to the determination of whether Mesabi Academy was on notice of Gustafson's, Lawson's and Muehlberg's respective propensities to harass female employees. However, the court fails to see how incidents that occurred prior to Vajdl's employment period are relevant to the pervasiveness of the alleged hostile work environment that she worked in. Therefore, the court has not taken that conduct into consideration
(continued...)

that these actions were simply not severe or pervasive enough to be actionable under either Title VII or the MHRA.  None of the comments of Vajdl's co-workers were physically threatening in nature.  As to Gustafson, his offensive comments to Vajdl were infrequent.  Following orientation, Vajdl did not work a single shift with Gustafson.  Further, the court finds that the substance of his comments, although offensive, does not rise to a level of actionable harassment.  The conduct by Lawson was also infrequent. The note Lawson wrote Vajdl was undoubtedly sophomoric.  However, the note is similar to conduct that the Eighth Circuit has held insufficient to create a pervasive environment of hostility, even when coupled with other activity.  See, e.g., Duncan v. Gen. Motors Corp., 300 F.3d 928, 935 (8th Cir. 2002) (Man Hater's Club poster, penis-shaped pacifier, screen saver of naked woman and sexually objectionable planter not actionable conduct); Tuggle v. Mangan, 348 F.3d 714, 722 (8th Cir. 2003) (posting picture of plaintiff's rear end coupled with comments insufficient).

As to Muehlberg, his comments and conduct were the most persistent, occurring on a nearly daily basis.  However, his comments and conduct were neither lewd nor physically threatening. See Henthorn v. Capitol Communications, Inc., 359 F.3d 1021, 1028 (8th Cir. 2004) (repeated requests to go out and telephone calls to

---

[3](...continued)
in evaluating plaintiff's claims.

home, without inappropriate touching, insufficient); Ottman v. City of Independence, 341 F.3d 751, 760 (8th Cir. 2003) (consistent belittling of female employees and sexist remarks on nearly a daily basis insufficient).  Muehlberg's comments to Vajdl may have been incessant and immature.  However, the court finds that they do not surpass the high level of actionable harassment that the Eighth Circuit has established.  See Ottman, 341 F.3d at 760 (mere offensive utterances insufficient); Alagna, 324 F.3d at 977-79 (calls to plaintiff's home, frequent visits to office, discussions about relationships with women, touching plaintiff's arm, placing romance novels in mailbox, invading personal space and saying he loved her insufficient).

Taking all the comments and conduct that Vajdl asserts, those of Muehlberg, Gustafson and Lawson, the court finds that she has not established that the conduct of her co-workers "poisoned the work environment."  Scusa, 181 F.3d at 967; see also Duncan, 300 F.3d at 934-35 (although "boorish, chauvinistic, and decidedly immature," conduct did not rise to level of objectively hostile work environment).  Accordingly, Vajdl has not established that the conduct of her co-workers altered a term, condition or privilege of her employment.

Further, Vajdl has failed to show that Mesabi Academy knew, or should have known, of the harassing conduct and failed to take appropriate and reasonable remedial action.  See Kopp, 13 F.3d at

269.  Prior to January 21, 2004, Vajdl never reported any harassing conduct to her supervisor, Jacobson, or any member of Mesabi Academy management.[4]  (Vajdl Dep. at 162-63.)  Vajdl relies heavily upon Muehlberg's history of harassing other women at Mesabi Academy to support her argument that it failed to take reasonable remedial action in response to that conduct.  The court finds that Muehlberg's history was sufficient to put Mesabi Academy on a general notice that he had a tendency to harass women.  However, Muehlberg's disciplinary record did not give Mesabi Academy notice that he was harassing Vajdl.  The court declines to impose liability on Mesabi Academy based upon its failure to respond appropriately to employee misconduct that Vajdl never reported.

The harassing conduct of Muehlberg came to Mesabi Academy's attention only as a result of Borowicz's e-mail that informed Jacobson that Vajdl and Muehlberg should no longer work together. Jacobson then took the initiative to inquire about the situation and proceeded to investigate Vajdl's allegations.  Mesabi Academy promptly issued Muehlberg a final written warning and transferred him to the Endeavor Unit.  Vajdl argues that Mesabi Academy's

---

[4]  Plaintiff justifies her failure to report the harassing conduct by arguing that she relied on Lenzen's advice.  This argument might be persuasive if Lenzen was plaintiff's supervisor. However, the court finds that the record does not establish that, as a shift manager, Lenzen had any authority to take employment actions against Vajdl.  See Joens, 354 F.3d at 940.  Therefore, the court declines to hold that Mesabi Academy was on notice of Muehlberg's conduct based upon the information that Vajdl conveyed to Lenzen.

issuance of written warnings were not effective on Muehlberg based upon his history and repeated refusal to sign them.  However, Vajdl does not identify any harassing conduct that occurred after Mesabi Academy became aware Muehlberg's conduct towards her.  For all of the above reasons, summary judgment in favor of KidsPeace and Mesabi Academy is warranted on plaintiff's hostile work environment claims based on her co-worker's conduct.

## B.   Retaliatory Discharge Claim

KidsPeace and Mesabi Academy argue that Vajdl has not established a prima facie case of retaliatory discharge under either Title VII or the MHRA.   To establish a prima facie retaliation claim under either statute, a plaintiff must show (1) that she engaged in protected activity, (2) her employer took an adverse employment action and (3) a causal nexus between the protected activity and the adverse action.  Hesse v. Avis Rent-a-Car Sys., Inc., 394 F.3d 624, 632 (8th Cir. 2005); see also Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th Cir. 2005) (same analysis applies to Title VII and MHRA claims).  The parties do not dispute that plaintiff engaged in protected activity.

To constitute an adverse employment action, an employer's action must result in a material change in employment.  LaCroix v. Sears, Roebuck, and Co., 240 F.3d 688, 691 (8th Cir. 2001).  Minor changes in working conditions that only inconvenience an employee do not constitute material changes in employment.  Spears v. Mo.

Dep't of Corr. & Human Res., 210 F.3d 850, 853 (8th Cir. 2000) (en banc). Poor performance reviews do not qualify as an adverse employment action if they do not have a tangible effect upon employment. Turner v. Gonzales, 421 F.3d 688, 696 (8th Cir. 2005) (unfavorable evaluations actionable only if they result in detrimental impact on employment conditions).

Vajdl argues that Jacobson's memo recommending termination of her employment and subsequent issuance of the written warning constitute adverse employment actions. The court disagrees. As to the memo, Mesabi Academy did not act on Jacobson's recommendation and Vajdl's employment was not terminated. As to the issuance of the written warning, Vajdl emphasizes that she lost her ability to issue sanctions. However, Vajdl did not lose her ability to sanction youth. Rather, as part of the corrective action plan set forth in the warning, she was required to receive approval of a shift manager prior to imposing sanctions. Further, Vajdl testified that it was common for youth care workers who were targeted with inappropriate conduct to consult with other youth care workers or Mesabi Academy staff in determining the appropriateness of a sanction. (Vajdl Dep. at 58.) The warning involved no reduction in pay or benefits and had no direct implications on her ability to advance in employment with Mesabi Academy in the future. See Powell v. Yellow Books USA, Inc., 2006 WL 1071855, No. 05-2465, at *4 (8th Cir. Apr. 25, 2006) (three

written reprimands did not constitute adverse employment action). The court finds that the warning served as an inconvenience to Vajdl's ability to sanction youth, rather than a material change in the terms or conditions of her employment.[5]  See Spears, 210 F.3d at 853.  Therefore, summary judgment in favor of KidsPeace and Mesabi Academy is warranted on Vajdl's retaliation claim.

### C.  Constructive Discharge Claim

KidsPeace and Mesabi Academy argue that Vajdl has not established a prima facie case of constructive discharge under Title VII.  Constructive discharge under Title VII and the MHRA occurs when an employer forces an employee to quit by purposefully rendering the working conditions intolerable.  Baker v. John Morrell & Co., 382 F.3d 816, 829 (8th Cir. 2004); Bersie v. Zycad Corp., 339 N.W.2d 141, 146 (Minn. Ct. App. 1987).  To succeed on a constructive discharge claim, a plaintiff must show that (1) a reasonable person would have found the working conditions intolerable and (2) the employer either intended to force the employee to quit or could have reasonably foreseen that the employee would do so as a result of the conditions.  Wright v. Rolette County, 417 F.3d 879, 886 (8th Cir. 2005).  A claim for constructive discharge requires considerably more proof than an "unpleasant and unprofessional environment."  Jones v. Fitzgerald,

---

[5]  The court examines a Title VII retaliation claim under the burden-shifting analysis set forth in McDonnell Douglas v. Green, 411 U.S. 792 (1973).  Hesse, 394 F.3d at 632.

285 F.3d 705, 716 (8th Cir. 2002).  Constructive discharge does not occur when an employee quits without giving the employer a reasonable opportunity to resolve the issue.  <u>West v. Marion Merrell Dow, Inc.</u>, 54 F.3d 493, 498 (8th Cir. 1995).

Vajdl has offered no evidence that Mesabi Academy intended her to quit or could have reasonably foreseen her resignation following the remedial measures taken in response to her complaints.  To the contrary, Mesabi Academy took curative steps in an attempt to remedy the situation and prevent Vajdl from encountering Muehlberg.  As to any concerns that Vajdl had following Muehlberg's discipline and transfer, the court finds that she did not give Mesabi Academy a reasonable time to investigate or respond.  <u>See</u> <u>Duncan</u>, 300 F.3d at 936.  Therefore, summary judgment in favor of KidsPeace and Mesabi Academy is warranted on Vajdl's constructive discharge claim.

**III.   Motion for Summary Judgment by Muehlberg**

   **A.   Title VII Claim**s

Vajdl asserts claims of sex discrimination and retaliation against Muehlberg under Title VII.  However, Title VII liability attaches only to employers.  <u>Lenhardt v. Basic Inst. of Techn.</u>, 55 F.3d 377, 380 (8th Cir. 1995); <u>see also</u> 42 U.S.C. § 2000e(b) (defining an employer for purposes of Title VII as "a person engaged in an industry affecting commerce who has fifteen or more employees").  Co-workers cannot be held liable in their individual

capacities for Title VII violations.  Id.  Muehlberg was Vajdl's co-worker.  Therefore, the court grants defendant Muehlberg's summary judgment motion on Vajdl's Title VII claims.

**B.   MHRA Claims**

Vajdl asserts claims of aiding and abetting sexual harassment and unlawful reprisal against Muehlberg, in violation of the MHRA. See Minn. Stat. §§ 363A.14-.15.  Under the MHRA, a co-worker can be held individually liable for discrimination only upon a showing that he or she intentionally aided, abetted, incited or coerced another person to engage in a prohibited employment practice.  Id. § 363A.14.  In support of her aiding and abetting claim, Vajdl cites only to the informal, off-site meeting that Muehlberg held with Gustafson, Welsh and Borowicz to discuss his transfer to the Endeavor Unit and Vajdl's allegations that he was harassing her. Vajdl has put forth no evidence to establish that Muehlberg intentionally aided or abetted another Mesabi Academy employee to engage in unlawful employment discrimination.  Therefore, summary judgment in favor of Muehlberg is warranted on plaintiff's sexual harassment claim.

As to plaintiff's reprisal claim, the MHRA prohibits reprisals against any person who opposes an unlawful discriminatory action. See Minn. Stat. § 363A.15.  The court evaluates MHRA reprisal claims under the same analysis as Title VII retaliation claims. See Keuchle v. Life's Companion P.C.A., Inc., 653 N.W.2d 214, 221

(Minn. Ct. App. 2002); <u>Giuliani v. Stuart Corp.</u>, 512 N.W.2d 589, 594 (Minn. Ct. App. 1994).  Vajdl's MHRA reprisal claim fails for the same reason that her Title VII retaliation claim fails.  Vajdl has failed to establish that Muehlberg took an actionable adverse employment action, or that he was capable of taking such an action, against Vajdl.  Therefore, summary judgment in favor of Muehlberg is warranted on plaintiff's reprisal claim.

### CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1.    Defendants KidsPeace and Mesabi Academy's motion for summary judgment [Doc. No. 27] is granted.

2.    Defendant Muehlberg's motion for summary judgment [Doc. No. 34] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  May 10, 2006

s/David S. Doty
David S. Doty, Judge
United States District Court
